IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| BRAZOS ELECTRIC POWER COOPERATIVE, INC. | § § § | |
| Plaintiff, | § § § | |
| vs. | § § § | CAUSE NO.:  1:14-cv-00893 |
| SAN MIGUEL ELECTRIC COOPERATIVE, INC. AND THE RURAL UTILITIES SERVICE | § § § § § | |
| Defendants. | § § | |

**PLAINTIFF BRAZOS ELECTRIC POWER COOPERATIVE, INC.'S
ORIGINAL COMPLAINT**

Plaintiff Brazos Electric Power Cooperative, Inc. ("Brazos") files this complaint against Defendants San Miguel Electric Cooperative, Inc. ("San Miguel") and the Rural Utilities Service, a division of the United States Department of Agriculture (formerly the Rural Electrification Administration or "REA") ("RUS"), seeking a declaratory judgment from this Court pursuant to 28 U.S.C. §§ 2201 *et seq.*

**I.    NATURE AND SUMMARY OF COMPLAINT**

1. This lawsuit concerns the proper construction of the contracts that govern the purchase by Brazos of electric capacity and energy from San Miguel—the owner and operator of an approximately 400 megawatt ("MW") lignite-fired generating plant and associated mining facilities in Christine, Texas (the "Project"). The Project's fundamental purpose is to furnish electric capacity and energy to Brazos and Brazos's fellow patron of San Miguel, South

16835210

Texas Electric Cooperative, Inc. ("STEC").  Brazos and STEC are individually referred to as a "Member" of San Miguel, and together as San Miguel's "Members."

    2.  This relationship is governed by three long-term agreements that were executed in Travis County, Texas on June 7, 1978:

    (i)  Brazos and San Miguel entered into a Wholesale Power Contract, as amended by Amendment No. 1 (the "Brazos Power Contract," attached as Ex. A);

    (ii)  STEC and San Miguel entered into a nearly identical Wholesale Power Contract (the "STEC Power Contract," attached as Ex. B); and

    (iii)  Brazos, STEC, and San Miguel entered into a Coordination Contract (attached as Ex. C).

Together, the Brazos Power Contract and the STEC Power Contract are referred to as the "Power Contracts."  The Power Contracts and the Coordination Contract are collectively referred to as the "Contracts."[1]  The Contracts address the terms and conditions under which Brazos and STEC purchase, and San Miguel sells, electric capacity and energy from the Project.

    3.  Brazos and STEC are the only purchasers of the Project's capacity and the energy it generates.  Under the Power Contracts, Brazos and STEC must each pay for fifty percent (50%) of the net capacity of the Project.  In return, each is entitled to 50% of the approximately 400 MW capacity of the Project.  The Power Contracts, however, permit Brazos and STEC to schedule the generation and delivery of energy from all or only a portion of their 50% share of the generating capacity of the Project, so long as the energy schedules of Brazos and STEC, when added together, meet the minimum net generation requirements of the Project.

---

[1]  Each of the Contracts had an initial term that expired on June 30, 2020, but the Power Contracts were later extended by amendment to December 31, 2037. (Ex. A, Brazos Power Contract at Amendment No. 1.)

4. Consistent with the Contracts' terms, in 2014, Brazos scheduled less energy for 2015 from its 50% capacity share of the Project than STEC scheduled for 2015 from its 50% capacity share, but neither Brazos nor STEC scheduled all of the energy that could be generated from their respective capacity shares of the Project.

5. San Miguel disagrees that the Contracts allow Brazos to schedule energy in this manner, and has provided Brazos with an illustration of San Miguel's interpretation of the Contracts. Under San Miguel's interpretation, Brazos must either (i) take and pay for the same amount of energy in 2015 as STEC, or (ii) be subject to a "Projected Article 8 Billing" for 2015 of nearly $8.7 million, an amount that exceeds the proper billing amount considering Brazos's tendered energy schedule for 2015. San Miguel acknowledges that there is a continuing conflict over the proper interpretation of the Contracts.

6. Brazos files this complaint against San Miguel and RUS to determine the proper construction of the Contracts, including but not limited to the proper calculation of billing rates when Brazos exercises its contractual right to schedule less energy from its 50% capacity share than STEC schedules from its 50% capacity share of the Project.

## II.   PARTIES

7. Plaintiff Brazos is a Texas generation and transmission cooperative corporation and maintains its principal place of business in Waco, McLennan County, Texas.

8. Defendant San Miguel is a Texas generation and transmission cooperative corporation with its principal place of business in Jourdanton, Atascosa County, Texas. San Miguel can be served through its registered agent, Derrick L. Brummett, 6200 FM 3387, Christine, Texas 78012.

9. Defendant RUS is a division of the United States Department of Agriculture and may be served by serving a copy of the summons and complaint by registered or

certified mail on: (i) Robert Pitman, United States Attorney for the Western District of Texas, at the United States Attorney's Office, 816 Congress Avenue, Suite 1000, Austin, Texas 78701; (ii) Eric H. Holder, Jr., Attorney General of the United States at the United States Department of Justice, 950 Pennsylvania Avenue, NW, Washington, D.C. 20530-0001; and (iii) the Administrator of RUS, Jacqueline Point-Lazaruk, USDA Rural Development, Rural Utilities Service, 1400 Independence Avenue, SW, Room 5135, STOP 1510, Washington, D.C. 20250-1535.

### III.   JURISDICTION AND VENUE

**A.   Jurisdiction**

10. This Court has subject matter jurisdiction over this lawsuit because federal courts have jurisdiction over "Controversies to which the United States shall be a Party." U.S. Const. art. III, § 2, cl. 1. Defendant RUS is a federal agency and thus, this is a "Controvers[y] to which the United States [is] a Party." This Court also has subject matter jurisdiction over this lawsuit under 28 U.S.C. § 1331 because there is a question "arising under" the laws of the United States when a party, such as Brazos, seeks interpretation of contracts drafted and approved by a federal agency pursuant to a federal statutory scheme. *Price v. Pierce*, 823 F.2d 1114, 1119–1120 (7th Cir. 1987). Finally, this Court has subject matter jurisdiction over this declaratory judgment suit pursuant to 28 U.S.C. §§ 2201 *et seq.*

11. RUS is also a necessary party under Federal Rule of Civil Procedure 19(a). Its predecessor agency (REA) was involved in the formation and approval of the Contracts. The Contracts serve as the primary collateral for the loans from RUS to finance the Project, and RUS is a third party beneficiary under Amendment 1 to the Brazos Power Contract. (Ex. A, Brazos Power Contract, Amendment No. 1 at 8.A.02.) RUS approval is also required for various actions taken under the Contracts. (*Id.*)

12. This Court has both general and specific jurisdiction over San Miguel because it is a Texas generation and transmission cooperative corporation and maintains its principal place of business in Texas, and because Brazos's causes of action arise from and are directly related to San Miguel's contacts within the Austin Division of the Western District of Texas. The Court has personal jurisdiction over RUS because Brazos's causes of action arise from and are directly related to RUS's contacts within the Austin Division of the Western District of Texas. In particular, the Contracts were negotiated and executed in Travis County, Texas, and Brazos and STEC formed and incorporated San Miguel in Travis County, Texas. Brazos, STEC, and San Miguel then spent more than a year negotiating the Contracts at various locations in Travis County, Texas—all subject to RUS's ultimate approval. Thus, the exercise of personal jurisdiction over Defendants San Miguel and RUS does not offend traditional notions of fair play and substantial justice.

**B.     Venue**

13. Venue is proper in the United States District Court for the Western District of Texas, Austin Division, under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to Brazos's causes of action occurred in this Division, and because the Defendants are subject to personal jurisdiction in this Division. Specifically, the negotiation, execution, and subsequent administration of the Contracts that form the basis of this suit took place and/or continue to take place in Travis County, Texas.

### IV.     FACTS

**A.     Formation of San Miguel**

14. In 1972, Brazos and STEC began planning to jointly construct, own (as tenants in common), and operate the Project. In furtherance of that plan, Brazos and STEC secured interim financing, thereby incurring debt, and acquired assets, including obtaining

options on lignite leases. Construction began in 1976, while Brazos and STEC continued negotiations to enter into long-term agreements governing the Project's operation, and their respective rights and obligations with regard to the capacity of and energy generated by the Project.

15. Because both Brazos and STEC were already RUS borrowers, they planned to secure long-term financing from RUS for the construction of the Project. As a condition of such financing, RUS required that Brazos and STEC form a separate electric cooperative to construct, own, and operate the Project.[2]

16. At a joint meeting in Austin, Texas in 1977, Brazos and STEC entered into a Memorandum of Understanding ("MOU") for the formation of San Miguel. Under the MOU, Brazos and STEC agreed to form San Miguel and that San Miguel would own and operate the Project and associated mining facilities as a rural electric cooperative. San Miguel was formed on February 17, 1977, to be operated "for the mutual benefit" of its patrons: Brazos and STEC. (San Miguel Bylaws at Art. IX, § 1, attached as Ex. D.) San Miguel's Members include Brazos, Brazos's sixteen distribution cooperative members, STEC, and STEC's eight distribution cooperative members.

17. RUS drafted the Contracts, which were subject to approval by and approved by RUS (referred to in the Contracts as the "Administrator"). RUS required execution of the Contracts by Brazos, STEC, and San Miguel as a condition of RUS's agreement to provide long-term financing for construction of the Project. RUS engaged in only limited negotiations with Brazos on a few provisions of the Contracts, which are not relevant to this dispute. In effect, the terms and provisions of the Contracts were dictated by RUS. RUS has certain

---

[2] RUS has regulatory oversight of rural electric cooperative borrowers such as San Miguel and has certain rights of approval and enforcement of the terms of the disputed Contracts. (Exs. A & B, Power Contracts at Art. 10.04 & Brazos Power Contract, Amendment No. 1 at 8.A.02.)

approval rights under the Contracts as the successor in interest to REA, and is named as a third-party beneficiary with the right to enforce the Power Contracts by Amendment No. 1 to the Power Contracts.  (Ex. A, Brazos Power Contract, Amendment No. 1 at 8.A.02.)

18. Brazos reviewed and discussed the draft Contracts with Don Olsen, Southern Area Director of RUS (the employee at RUS primarily responsible for drafting the Contracts) at a Brazos special-called board meeting held in Travis County, Texas on June 6, 1978.  On June 7, 1978, Brazos, STEC, and San Miguel, in conjunction with a regular meeting of the San Miguel Board in Travis County, Texas, at which Don Olsen and other RUS representatives were present, executed the Contracts, which collectively govern their rights and obligations with respect to Brazos's and STEC's entitlement to the capacity of and energy generated by the Project.

19. Brazos, STEC, and San Miguel executed all of the Contracts on the same date, in Austin, Travis County, Texas and the Contracts cross-reference each other.  The Contracts are inextricably intertwined and inter-dependent contracts.

**B.     Key Provisions of the Contracts**

20. Power plants can sell two basic products:  capacity and energy.  Capacity is measured in megawatts (MWs) and is the ability and readiness of a power plant to generate energy if and when needed.  Energy, measured in megawatt hours (MWhs), is electric energy actually generated by a power plant.

**Scheduling**

21. In order to cover San Miguel's costs while at the same time allowing future flexibility for Brazos and STEC to supply energy to their respective member cooperatives, for resale to rural retail consumers, Article 3 of the Power Contracts provides Brazos and STEC the right to schedule energy from their respective capacity shares of the Project and places on

San Miguel the responsibility to schedule and dispatch the Project considering Brazos's and STEC's schedule of their respective capacity and energy requirements from the Project:

> The Member shall provide San Miguel schedules of its capacity and energy requirements from the Project pursuant to the San Miguel Project Coordination Contract of even date hereof. San Miguel shall have the sole responsibility, considering the Member's schedule of requirements, to schedule and dispatch power and energy from the Project.

(Exs. A & B, Power Contracts at Art. 3.)

22. Several other provisions of the Contracts confirm Brazos's and STEC's right to schedule only the energy each wants and needs, subject to San Miguel's Minimum Net Generation requirement. Under Article 10.01 of the Power Contracts, San Miguel must "use reasonable diligence to provide a constant and uninterrupted *scheduled* supply of electric power and energy." (*Id.* at Art. 10.01 (emphasis added).) Additionally, Article 3 of the Coordination Contract requires the development of "procedures for the *scheduling* of power and energy." (Ex. C, Coordination Contract at Art. 3(a) (emphasis added).) The only limitation on Brazos's and STEC's scheduling rights is the requirement that, when either Brazos or STEC wants to schedule energy from the Project, thereby requiring the Project to operate and generate such energy, Brazos and STEC must schedule (collectively) the Minimum Net Generation requirement of San Miguel, which is defined as the "lowest continuous net power output at which the generating Project can be reliably maintained in service." (*Id.* at Art. 1.04.) Moreover, Article 5 of the Coordination Contract expressly contemplates that Brazos may schedule energy from its 50% share of Minimum Net Generation, but that it may at times be excused from all or part of even this minimum scheduling requirement:

> The percent of Minimum Net Generation which Brazos and STEC shall each be obligated to schedule shall be at least as great as the percent of Project Capacity for which each is responsible during that Contract Year. In the event that only Brazos or STEC

>schedules a percent of Minimum Net Generation which exceeds the percent of Minimum Net Generation it is obligated to schedule, the other shall, at its request and with the concurrence of San Miguel, *be excused from its schedule to the extent that Minimum Net Generation is maintained.*

(*Id.* at Art. 5 (emphasis added).)

23. Under these provisions, Brazos is *not* required to take and pay for (a) 50% of the Project's *maximum possible* net energy output, or (b) 50% of the Project's *actual* net energy output. The Contracts are not, as San Miguel wrongfully interprets them, "put" contracts under which San Miguel may require Brazos to take and pay for 50% of whatever energy San Miguel wants to generate. If that were the case, then San Miguel could simply run the Project at its full energy output level, or whatever output level San Miguel decides, and Brazos and STEC would each be obligated to take and pay for 50% of all energy generated by the Project. There would be no need for any of the scheduling provisions discussed above. Turning the Contracts into "put" options for San Miguel is not only inconsistent with the Contracts, as a whole, but also with Brazos's, STEC's, and San Miguel's course of dealings in years past, and would be a violation of San Miguel's Bylaws, which state that San Miguel must operate "for the mutual benefit" of its patrons, Brazos and STEC. (Ex. D, San Miguel Bylaws at Art. IX, § 1.)

24. Instead, Article 5 of the Coordination Contract expressly contemplates that the Project will be run at less than full capacity and that Brazos and STEC may have differing schedules of energy. (Ex. C, Coordination Contract at Art. 5.) In fact, Article 5 allows for either Brazos or STEC to take no energy from the Project so long as the Minimum Net Generation is maintained by the scheduled energy from the other, subject only to the concurrence of San Miguel. (*Id.*) San Miguel has no right to withhold its concurrence unreasonably.

**Rate Structure**

25. Article 7.02 of the Power Contracts establishes how the separate rates for capacity and energy are to be calculated. Because San Miguel is a non-profit electric cooperative, such rates must be "sufficient, but only sufficient" to recover San Miguel's actual costs:

> The Board of Directors of San Miguel . . . not less frequently than once in each calendar year, shall review . . . and, if necessary, shall revise such rate so that it shall produce revenues which shall be *sufficient, but only sufficient* with the revenues of San Miguel from all other sources, to meet the cost of the operation and maintenance (including without limitation, replacements, insurance, taxes and administrative and general overhead expenses) of the generating plant, transmission and other Project related facilities of San Miguel.

(Exs. A & B, Power Contracts at Art. 7.02 (emphasis added).)

26. With respect to capacity, Article 2 of the Power Contracts obligates Brazos and STEC to "purchase and receive a fifty percent (50%) share of the Project Capacity." (*Id.* at Art. 2.) The term "Project Capacity" is defined to mean the "net capacity and net energy output of the Project." (*Id.* at Art. 1.08.) All parties agree that under this provision, Brazos must pay for 50% of the Project's net capacity (i.e. MWs). The rate for such capacity is determined under Article 7.02(a), which provides a $/MW capacity component as part of the Project's rate structure.

27. Out of context, and inconsistent with industry norms, San Miguel now interprets Article 2 of the Power Contracts to mean that San Miguel may run the Project at its maximum energy output level, and that Brazos and STEC are each obligated to take and pay for 50% of the resulting net energy output (i.e. MWhs), whatever that output may be. (*Id.* at Art. 2.) However, Article 2 must be read consistent with the underlying purpose of the Contracts, the Contract's terms as a whole, and consistent with industry norms, which provide that capacity is

measured in MWs, and is an entirely distinct concept from energy, which is measured in MWhs, a critical ambiguity created by the literal definition of "Project Capacity." Properly construed, Article 7.01(b) of the Power Contracts makes clear that Brazos and STEC only pay for that electric energy (MWhs) actually provided:

> [Brazos] agrees to pay for electric power and energy *furnished* by San Miguel *to it* hereunder at the rate from time to time established. . . .

(*Id.* at Art. 7.01(b) (emphasis added).) Reading Article 2 as interpreted by San Miguel would render meaningless too many other provisions of the Contracts, including:

- the Power Contracts Article 3 right to schedule energy;

- the obligation of San Miguel to honor schedules under Power Contracts Article 10.01;

- Brazos's and STEC's obligation under Power Contracts Section 7.01(b) to pay for only that energy output actually furnished (as scheduled pursuant to Article 3); and

- the rights and obligations regarding Minimum Net Generation in Coordination Contract Article 5.

28. Sections 7.02(b) and 7.02(c) establish an energy component and fuel component of the Project's rate structure. Both the energy component and fuel component are based on the "estimated net energy to be produced" during a given Contract Year. If the estimated net energy production is based on the actual scheduling information submitted by Brazos and STEC, and if San Miguel dispatches according to those schedules, then the fuel and energy components of the rate structure should recover the energy and fuel costs of the Project. However, San Miguel interprets the Contracts to require, in the event Brazos and STEC schedule different amounts of energy for a Contract Year, that San Miguel double the amount of the higher energy schedule to determine the "estimated net energy to be produced" during the Contract Year. If the schedules and rates are set as proposed by San Miguel—by doubling the

higher schedule and ignoring the lower schedule—then either (a) the fuel and energy components will recover less than the actual fuel and energy costs of the Project, or (b) the buyer with the lower schedule will be forced to take and pay for energy it did not schedule.  Neither outcome is permitted under the Contracts.

### San Miguel's Total Cost of the Project

29. Under Article 8 of the Power Contracts, Brazos and STEC are collectively responsible for San Miguel's total cost of owning and operating the Project.  Each is responsible for its applicable percentage share of those costs.  Read in isolation and out of context, San Miguel interprets the first two sentences of Article 8 as requiring that Brazos pay its 50% share of all costs, including the variable costs to be recovered by the energy component and the variable and fixed costs to be recovered by the fuel component, even if Brazos takes less than 50% of the Project's energy output:

> The Members shall collectively be responsible for San Miguel's total cost of owning and operating the Project, including, without limitation, payments due on account of principal and interest on all indebtedness of San Miguel.  The percent of San Miguel's total costs for which the Member is responsible shall be equivalent to the Member's percent share of the Project Capacity during the applicable Contract Year, as determined in accordance with the provisions of Article 2 hereof.

(Exs. A & B, Power Contracts at Art. 8.)

30. However, Article 8 must be interpreted in its entirety and in the context of the Contracts as a whole.  In this regard, Article 8 contains additional language that explains its relation to the rest of the Power Contracts:

> Payments made by the Member pursuant to the provisions of Article 7 hereof shall be credited to the Member's obligation as set forth in this Article.  The obligations of the Member under this Article shall not be deemed to limit the obligations of San Miguel to use reasonable diligence to provide a constant and uninterrupted

> scheduled supply of electric power and energy, pursuant to the provisions of Section 10.01 hereof.

(*Id.*) Payments made by Brazos pursuant to Article 7 are to be credited against its obligation under Article 8 to cover San Miguel's costs. It is only *after* Article 7 rates are paid by and credited to both Brazos and STEC—including rates for the energy and fuel components based on the energy output scheduled by and delivered to each—that Brazos is then responsible for its applicable percentage share of any *remaining, uncovered* portion of total costs. The rates under Article 7 are required to be sufficient, but only sufficient, to cover San Miguel's costs. So, there should be no Article 8 deficiency, if San Miguel properly sets its rates. This interpretation is also supported by the final sentence of Article 8, which obligates San Miguel to deliver *scheduled* energy paramount to the Article 8 cost responsibility. (*Id.*)

**C.     The Current Dispute**

31.     The Project began commercial operations in 1982. For the first several years, Brazos and STEC agreed—as permitted under the Contracts—that Brazos would be entitled to a higher share of San Miguel's capacity and energy than STEC. Starting in 1980, Brazos had the right to schedule energy from its 71.75% share of San Miguel's capacity, while STEC had the right to schedule energy from the remaining 28.25% of San Miguel's capacity. Over the next decade, Brazos's share of capacity decreased, while STEC's share of capacity increased, as provided in the Contracts.

32.     By 1986 or 1987—and in each year since—Brazos and STEC each had the right to schedule and receive energy from 50% of San Miguel's capacity, as provided in the Contracts. In most years since that time, Brazos and STEC have scheduled equal amounts of energy from the Project; but the actual amounts of energy taken by Brazos and STEC were rarely, if ever, equal. Nor were they required to be under the Contracts.

33. Until 2013, Brazos and STEC have scheduled all or nearly all of the available energy output from their respective 50% shares of capacity, with the result that the Project was dispatched at a nearly full capacity factor (over 70%).

34. During 2014, Brazos scheduled 712,031 MWhs of energy for 2015 out of its 50% capacity share, while STEC scheduled 1,421,000 MWhs of energy for 2015, out of its 50% capacity share. In response, and despite the rate calculations required under Article 7 of the Power Contracts, San Miguel informed Brazos and STEC that, rather than using their combined 2015 energy schedules (as it has done consistently in the past), San Miguel interpreted the Contracts as requiring San Miguel to calculate rates by doubling the higher energy schedule of STEC as the "estimated energy to be produced from the plant during" 2015, which is then used to calculate the rates for the energy component and the fuel component.

35. In other words, San Miguel proposed—for the first time since it commenced operations in the early 1980s—to calculate the energy and fuel components of San Miguel's rates by multiplying one customer's higher energy schedule by two, effectively disregarding the other customer's lower energy schedule. If San Miguel calculated its fuel and energy components as they have threatened, and Brazos schedules and receives only the energy it has scheduled for 2015, San Miguel stated that it would bill Brazos under Article 8 of the Power Contracts for any revenue shortfall created by San Miguel's wrongful rate-setting.

36. San Miguel acknowledges that there is a continuing conflict over the interpretation of the Contracts. Moreover, San Miguel provided Brazos with an illustration of its contract interpretation, which shows "Projected Article 8 Billing" for 2015 of nearly $8.7 million, an amount that exceeds the proper billing amount considering Brazos's tendered energy schedule for 2015.

37. In the current electric energy market in ERCOT, Brazos is able at various times during the year to purchase energy at lower costs than the rates for energy generated from the Project, thus reducing the cost of electric energy to Brazos, its member distribution cooperatives, and their rural retail customers.

38. San Miguel anticipates large capital expenditures and indebtedness relating to opening one or more additional lignite mines, which will be necessary if San Miguel follows its misinterpretation of the Contracts and continues to generate more energy than is actually scheduled by STEC and Brazos for 2015. Consistent with the overall objective and purpose of RUS, Brazos seeks to enforce its rights to reduce its energy schedules from the Project to mitigate its risks and obligations, and ultimately reduce the risks and cost of power for its member distribution cooperatives and their rural retail customers.

39. If San Miguel's interpretation of the Contracts prevails, San Miguel would generate more energy than Brazos's and STEC's combined needs, and Brazos would be required to take and/or pay above-market prices for energy from San Miguel that Brazos does not need and has not scheduled. Further, under San Miguel's interpretation, Brazos would be forced to subsidize STEC's share of the energy from Project, because San Miguel would be calculating lower rates for energy and fuel due to the artificial increase in the estimated net energy to be produced by the Project during the Contract Year. This runs afoul of the purpose and terms of the Contracts, which state that the variable costs of energy produced by the Project and the variable and fixed cost of the fuel associated with that energy are to be paid based on the energy actually furnished to each Member (Exs. A & B, Power Contracts at Art. 7.01(b)), and at a rate calculated using the estimated net energy to be produced by the Project during the Contract Year (*Id.* at Art. 7.02(b)–(c)). Finally, San Miguel's interpretation of the Contracts requires Brazos to

take and pay for whatever energy San Miguel generates without regard to Brazos's scheduled energy needs and despite San Miguel's obligation to operate San Miguel for the mutual benefit of Brazos and STEC.

40. For all of these reasons, a justiciable controversy has arisen regarding the proper interpretation of the Contracts concerning, among other things, the calculation of rates when Brazos exercises its right to schedule less energy from its 50% share of the capacity of the Project than STEC schedules from its 50% share of the capacity of the Project.

V. **CLAIM FOR RELIEF: DECLARATORY JUDGMENT (28 U.S.C. §§ 2201 *ET SEQ.*)**

41. Brazos incorporates each of the foregoing paragraphs above as if fully set forth herein.

42. Brazos has scheduled less energy for 2015 from its 50% capacity share of the Project than STEC scheduled for 2015 from its 50% capacity share, and Brazos has requested that San Miguel set rates based on the amount of energy actually scheduled by Brazos and STEC. San Miguel, however, has delayed in approving Brazos's schedule for energy and has threatened in several communications to Brazos to set rates by doubling STEC's higher amount of scheduled energy and to require Brazos to take and pay for energy in excess of Brazos's scheduled amounts. San Miguel's actions and interpretation of the Contracts violate the terms of the Contracts and the terms of San Miguel's Bylaws.

43. An actual, justiciable controversy has therefore arisen and now exists among Brazos, San Miguel, and RUS concerning Brazos's and San Miguel's respective rights and obligations under the Contracts. In particular, a controversy presently exists concerning San Miguel's obligation to set rates and generate and furnish energy to Brazos based upon the amount of energy scheduled by Brazos, and San Miguel's obligation to accept differing levels of

energy scheduled from Brazos and STEC so long as Minimum Net Generation is maintained by the two schedules combined.

44. Based on the foregoing, a declaratory judgment is both necessary and proper to set forth and determine the rights, obligations, and liabilities of San Miguel and Brazos pursuant to the Contracts. Brazos therefore requests a declaratory judgment that under the ambiguous terms of the Contracts as properly interpreted in light of relevant parol evidence:

    a. the Administrator of RUS has replaced the role of the Administrator of the REA in the Contracts;

    b. the Contracts, and in particular the Brazos Power Contract and the Coordination Contract, are inextricably intertwined and inter-dependent contracts;

    c. if STEC schedules energy from the Project, thereby requiring the Project to operate and generate such energy, then Brazos has the right but not the obligation to schedule any amount of energy from its 50% share of the capacity of the Project, so long as the Minimum Net Generation is maintained;

    d. Brazos does not have to schedule energy in the same quantities that STEC schedules energy during any Contract Year;

    e. Brazos is not obligated to take or to pay for excess energy San Miguel generates in disregard of Brazos's schedule;

    f. for the purpose of calculating the energy and fuel rates ($/MWh) under Article 7.02(b) and (c) of the Contracts, the "estimated net energy to be produced by the plant during the Contract Year" is the sum of the

        estimated energy requirements that Brazos and STEC respectively schedule under Article 3 of their respective Power Contracts;

g.    if Brazos's scheduled energy (MWhs) is less than STEC's, Brazos is responsible only for the payment of energy and fuel rates for energy (MWhs) Brazos actually schedules and is furnished from the Project, and Brazos is not obligated to pay for energy and fuel rates, or to take or to pay for any energy from San Miguel, over and above Brazos's scheduled energy;

h.    Article 10.01 of the Brazos Power Contract obligates San Miguel to use reasonable diligence to supply to Brazos the energy Brazos schedules;

i.    the San Miguel Board is obligated, at least annually, to review and revise its rates, including its energy and fuel rate components, to recover its costs, including reasonably anticipated long-term capital costs, and thus avoid an Article 8 deficiency;

j.    to the extent Article 5 of the Coordination Contract requires the "concurrence" of San Miguel to excuse Brazos or STEC scheduling less than 50% of the Minimum Net Generation, San Miguel must act in good faith and may not withhold its concurrence unless concurring would not allow San Miguel to operate the Project safely and in accordance with law;

k.    Article 3 of the Power Contracts, which provides that San Miguel "shall have the sole responsibility, considering the Member's schedule of requirements, to schedule and dispatch power and energy from the Project" means that San Miguel is obligated to use reasonable diligence to

provide energy as scheduled by Brazos and STEC, subject to San Miguel's responsibility to operate the Project safely and to operate for the mutual benefit of Brazos and STEC.

## VI. PRAYER

45. For these reasons, Brazos respectfully requests that San Miguel and RUS be cited to appear and answer and, after a final hearing, the Court enter a judgment as follows:

a. Declaratory relief as requested by Brazos, declaring the rights of Brazos and San Miguel as specified above in Count One;

b. An award against San Miguel and to Brazos of reasonable attorneys' fees, costs, and pre- and post-judgment interest; and

c. An award to Brazos of all other relief, in law and in equity, to which it may show itself to be entitled.

DATED: September 25, 2014

          Respectfully submitted,

          BAKER BOTTS L.L.P.

          By: */s/ Kevin T. Jacobs*
              Kevin T. Jacobs
              State Bar No. 24012893
              Meghan Dawson McElvy
              State Bar No. 24065127
              One Shell Plaza
              910 Louisiana Street
              Houston, Texas 77002-4995
              Telephone:  (713) 229-1234
              Facsimile:  (713) 229-7847

          ATTORNEYS FOR PLAINTIFF
          BRAZOS ELECTRIC POWER
          COOPERATIVE, INC.

OF COUNSEL:
James H. Barkley (*pro hac vice forthcoming*)
State Bar No. 00787037
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, Texas 77002-4995
(713) 229-1234